# APPEAL OF MARY N. SEAGRAVE.

### [ESTATE OF DR. SCOTT STEWART, DECEASED.]

FROM THE DECREE OF THE ORPHANS' COURT OF PHILADEL-PHIA COUNTY.

Argued March 27, 1889—Decided April 8, 1889.
[To be reported.]

(a) The will of a testator bequeathed his library " unto the trustees of the hospital to be founded or established as hereinafter provided for, if the same shall have been founded within five years after the decease of my surviving sister, and if the said hospital shall not have been so founded or established, . . . . . in that event I give and bequeath said library unto my right heirs."   After bequeathing certain annuities and legacies, a codicil provided as follows :

(b) " The remaining principal of my residuary estate . . . . . I wish to be a nucleus for the erection of a hospital to be founded and established within five years after the decease of my last surviving sister . . . . . I authorize the conference of the Methodist Church for the district in which the city of Philadelphia is situate, which meets annually for the purpose of locating its clergymen and other church purposes, to organize in such a way as to it may seem best a scheme for this charity."

(c) " The certificate of the presiding bishop of the said conference shall be sufficient authority to my trustees for the payment of the money to such persons as he shall designate ; the receipts of such designated persons shall be good and sufficient vouchers . . . . . Of course I rely upon the said conference and bishop not to call for the payment of the money unless they have devised a scheme for the hospital, practical and seemingly certain of success."

(d) " I direct that, if within five years from the decease of my last surviving sister, by reason of the failure of such presiding bishop to certify persons to receive my residuary estate for the purpose aforesaid, the

Adjudication.

impracticability of the establishment of the proposed hospital shall have been demonstrated, that then immediately . . . . . my trustees shall pay my remaining residuary estate in fee to such persons as would have taken the same at my decease as heirs and next of kin."

1. In such case, it being made to appear that within five years after the death of the testator's last surviving sister the annual conference of said church had adopted a scheme for the foundation of the hospital, practical and seemingly certain of success, and the bishop having issued his certificate designating certain individuals as the board of trustees to receive and administer the bequest, the individuals so designated were entitled to receive the residuary estate for the use of the hospital, even though the buildings therefor had not been erected and the hospital put into successful operation.

Before PAXSON, C. J., STERRETT, CLARK, McCOLLUM and MITCHELL, JJ.

No. 129 July Term 1888, Sup. Ct.; court below, No. 206 July Term 1882, O. C.

On January 30, 1888, the second account of the Pennsylvania Company for Insurance on Lives, etc., executor of the will of Dr. Scott Stewart, deceased, showing a balance composed of cash and securities of $252,180.21, was called for audit, when W. S. S. Gay, Anne H. Valentine, Elizabeth Wardell, Mary N. Seagrave and a large number of others, appeared by counsel, and as the heirs at law of the decedent and as legatees and devisees under his will, claimed his library and the residue of his estate. The library and this residue were claimed also by the Methodist Episcopal Hospital in the city of Philadelphia.

The facts and the questions arising fully appear by the adjudication, PENROSE, J., which was as follows:

The account is of the residue of the estate of the testator, who died June 27, 1881, unmarried, and without issue, awarded to the accountant, November 16, 1882, by the adjudication of a former account, in trust for the purposes declared in the will and codicils, proved July 6, 1881, viz.: for the payment of certain annuities to Mary N. Seagrave and her husband, Anna H. Gay and Eliza Scott, for life, with provisions for payment of principal sums to their respective children, and for the payment of the income of the residue to Anna Holmes and Sarah

Gay, sisters of the testator, for life and the life of the survivor.

At the death of the survivor of the sisters, the will, which was dated November 1, 1877, after directing the payment of two legacies of $1,000 each, provided for the disposition of the residue as follows:

"In trust to pay over the balance . . . . . to the trustees of a hospital to be founded or established within five years after the decease of my surviving sister, in that part of the city of Philadelphia south of South street, and to be under the auspices of the Methodist Episcopal Church, provided said hospital shall be under the charge and care only of regularly educated physicians of the old school who shall have received the degree of A. B. from some university or college, and provided also that no homœopathic or eclectic physicians, as they call themselves, shall have anything to do with the management and charge of said hospital or with the treatment of any patient or patients therein, and in the event of said hospital not being founded or established within said period of five years, then, in trust, to pay over the balance of the said residuary estate, with the accumulated interest, unto my right heirs in the shares and proportions to which they would have been entitled had I died intestate."

By a codicil, dated June 21, 1879, changes were made in the disposition of the income of the residuary estate during the lifetime of his sisters, and the gift of the principal was modified as follows:

"In trust as to the remaining principal of my residuary estate, subject to the foregoing annuities and provisions, upon the decease of the last survivor of my said sisters, to pay thereout to the St. Paul's Methodist Episcopal Church, located on Catharine street, above Sixth street, in this city, the sum of $1,000 free of collateral inheritance tax, to be kept invested forever . . . . . in trust, further to pay thereout to The Mifflin Street Methodist Episcopal Church, located at Eleventh and Mifflin streets, the sum of $1,000 clear of collateral taxes.

"The remaining principal of my residuary estate on the said decease I wish to be used as a nucleus for the erection of a hospital to be founded and established within five years after

the decease of my last surviving sister, in that part of the city south of South street, to be under the auspices of the Methodist Episcopal Church ; said hospital must be under the charge or care only of regularly educated physicians of the old school who shall have received the degree of A. B. from some university or college, and no homeopathist or eclectic so-called physicians shall have anything to do with the management or charge of said hospital or with the treatment of any patient or patients therein. I authorize the conference of the Methodist Church for the district in which the city of Philadelphia is situated, which meets annually for the purpose of locating its clergymen, and for other church purposes, to organize in such way as to it shall seem best a scheme for this charity. I desire them to appoint a board of trustees, which may become incorporated or not. The certificate of the presiding bishop of the said conference shall be sufficient authority to my trustees for the payment of the money to such persons as he shall designate ; the receipts of such designated persons shall be good and sufficient vouchers for the payment of the residuary estate to them. To facilitate such payment, I authorize my trustees to convert my whole estate, real and personal, into cash if they shall deem it necessary, and I authorize them to make good deed or deeds of conveyance therefor in fee simple or for any less estate, without the purchaser or purchasers being obliged to see to or be responsible for the application of the purchase money.

" Of course I rely upon the said conference and bishop not to call for the payment of the money unless they have devised a scheme for the hospital, practical and seemingly certain of success. I do not wish my estate wasted in an abortive scheme, nor buildings commenced unless the funds at command are sufficient to erect, equip, and endow them. As I have said, my estate will be but the nucleus of what is requisite ; other contributions will be needed, and I am willing that what I leave shall be mingled with such contributions. I desire it distinctly understood, however, that in paying over my estate to such persons as shall be designated by the said bishop as competent to receive it, my trustees assume no responsibility as to the practicability of the scheme, nor as to the proper application of the fund thereto.

## Adjudication.

" I direct that if within five years from the decease of my last surviving sister, by reason of the failure of such presiding bishop to certify persons to receive my residuary estate for the purposes aforesaid, the impracticability of the establishment of the proposed hospital shall have been demonstrated, that then immediately upon the expiration of said period of five years my trustees shall pay my residuary estate in fee to such persons as would have taken the same at my decease as my heirs and next of kin under the intestate laws of Pennsylvania had I died without a will."

The will, which it will be seen was executed nearly two years before the codicil, contained the following specific legacy:

" Item 15. I give and bequeath my library unto the trustees of the hospital to be founded or established as hereinafter provided for, if the same shall have been founded within five years after the decease of my surviving sister, and if the said hospital shall not have been so founded or established within five years after her decease, then and in that event I give and bequeath my said library unto my right heirs."

The collateral inheritance tax upon the entire estate has been paid, credit therefor having been taken in the first account of the executor. The legacies of $1,000 each have been paid, and were credited in the second account, the last surviving sister having died, as set forth in the adjudication of that account, February 18, 1883.

Action was taken by the annual conference of the Methodist Episcopal Church with reference to the charity thus to be established, at least as early as 1882. The minutes of the conference for that year show that a statement was made by Bishop Simpson, and that the committee appointed by him made a report, which was adopted, accepting the trust " with its conditions and limitations." A board of trustees, composed of ten clergymen and eleven laymen, was elected, and the trustees so elected were subsequently organized, and from time to time held meetings with a view to the proper establishment of a hospital under the provisions of the will. By decree of the Court of Common Pleas No. 2, of Philadelphia, the " Methodist Episcopal Hospital" was incorporated, and a charter granted, the provisions of which are set forth in the adjudication filed January 23, 1886, of the second account of the ex-

Adjudication.

ecutor; and at or about the same time the presiding bishop (Cyrus D. Foss) of the Philadelphia annual conference of the Methodist Episcopal Church gave a certificate setting forth that he had appointed the persons therein named, " as trustees to receive the legacy of Scott Stewart, M. D., deceased, and to organize and establish a hospital in the city of Philadelphia, under the provisions of the last will and testament of the said Scott Stewart, M. D., deceased." The account referred to was filed for the purpose of bringing before the court the question of the right of the persons so appointed to demand the surrender of the residuary estate of the testator; and as, at that time, no scheme had been devised for the hospital, and the trifling subscriptions which had been made were conditioned upon the receipt by the board of such estate, the auditing judge was of opinion that the heirs and next of kin were entitled to have it remain in the custody of the executor. The reasons for this opinion were thus expressed in the adjudication:

" It is natural to suppose that the testater, when he provided for the establishment of a Methodist Episcopal hospital, had in his mind the similar charities already in existence under the auspices of the Presbyterian, the Episcopalian, the Jewish and the Catholic churches; and, thinking that a denomination of Christians so large and influential as that for which his magnificent gift was intended, would not be satisfied, if an institution to be known by their name did not at least equal these in size and usefulness, and that contributions would therefore at once be made with liberality, he declares that his estate, which, as the account shows, amounts to over $200,000, would be 'but a nucleus of what is requisite,' that 'other contributions will be needed,' and that he is willing that what he leaves 'shall be mingled with such contributions.' He seems to have thought that the buildings alone would cost as much as the sum given by him, for he says that he does 'not wish the buildings commenced unless the funds at command are sufficient to erect, equip and endow them.' All this, however, he leaves to the annual conference, which is 'to organize in such way as to it shall seem best a scheme for this charity;' and when so organized, the certificate of the presiding bishop shall be sufficient to warrant the payment by the trustees to the designated

persons. But the 'organization' of the scheme must precede the bishop's certificate. 'I rely,' he says, 'upon the said conference and bishop not to call for the payment of the money unless they have devised a scheme for the hospital, practical, and seemingly certain of success. I do not wish my estate wasted in an abortive scheme, nor buildings commenced unless the funds at command are sufficient to erect, equip and endow them.' If the scheme should prove 'abortive,' the estate is to go, at the expiration of the period prescribed, to his heirs and next of kin; and it will be abortive, in the sense understood by him, unless there should be funds 'at command' sufficient to 'erect' and 'equip,' as well as to 'endow.' As the effect of the certificate, when properly given, is to take away the rights of heirs and next of kin, they are, under well-settled principles, entitled to demand a strict compliance with the preliminary terms of the will, and to insist that the fund shall be retained by the trustees, for their protection, in the meanwhile."

After showing that no scheme had been adopted, and that everything which had been done up to that time was vague, incomplete, and indefinite, the adjudication proceeded as follows:

" Thus everything remains absolutely indefinite and without a fixed plan: the location and cost of the lot; the amount to be expended upon the erection of the necessary buildings; the character and expense of their equipment when erected; the time and manner of taking collections by the various churches; and whether the bequest of the testator shall be retained as an endowment fund, or otherwise expended for immediate necessities. Can it be said that the scheme devised is 'practical and seemingly certain of success?' The necessary funds are an essential part of success; and these, if not actually in hand, must, as the will declares, be 'at command,' at least in the sense of the subscriptions by individual members of the board of trustees. The auditing judge is of the opinion, therefore, that the estate cannot yet be taken from the accountant and placed beyond the reach of the heirs and next of kin of the testator. Two years, however, remain before it can be asserted that 'the impracticability of the proposed hospital shall have been demonstrated;' and there is little reason to doubt that in the meanwhile everything will be done by the Methodist Epis-

Adjudication.

copal Church of Philadelphia and its members, necessary for the organization and establishment of this charity. The payment of the money, in all probability, is therefore only a question of time; and in the custody of this accountant the fund will be entirely safe, and its accumulations will enure to the benefit of the party ultimately entitled to receive it."

The effect of this ruling, which was acquiesced in by the board of trustees, was to lead to more active efforts on the part of the church authorities. Appeals were made to the various congregations within the jurisdiction of the conference, as well as to individual members, and a scheme was suggested by the trustees and adopted by the conference, which, in the opinion of the auditing judge, is " practical and seemingly certain of success," especially in the light afforded by the evidence with regard to other similar charities, hereinafter referred to.

The scheme, which was adopted March 24, 1886 (the adjudication having been filed January 23d), was as follows:

" First. That the sum of one hundred thousand dollars be raised by the voluntary contributions of our members and friends, for the purchase of ground and the erection of buildings, of which amount one half should be raised in cash or valid subscriptions within one year.

" Second. That the trustees be authorized and instructed to purchase a suitable plot of ground, with or without buildings, at the earliest date that may be practicable, and to erect or prepare suitable buildings for the accommodation of the institution, and that they be recommended, if new buildings be erected, to construct them so as to allow of future symmetrical enlargement.

" Third. That the advisory board of physicians, already constituted by the trustees, be requested to prepare the necessary plans and rules for the internal organization of the hospital.

" Fourth. That the bequest of Dr. Scott Stewart be set apart and kept intact as the nucleus of an endowment fund, to be increased by other contributions, legacies, etc., as they may be received; provided, that until the institution shall be ready for the reception of patients, the income arising from said fund may be expended, in whole or in part, for the erection and equipment of the hospital.

" Fifth. That an association of contributors be formed, con-

stituted by annual payments of not less than five dollars, who shall be authorized, by suitable by-laws, under the charter, to elect annually or otherwise a sufficient number of laymen to constitute a majority of the trustees of the hospital.

" Sixth. That a member of the conference be appointed as financial agent to solicit and collect contributions to the building and endowment funds of the hospital, who shall be compensated for his services in such manner and to such amount as the trustees may determine."

The Rev. James Neill was appointed financial agent of the Methodist Episcopal Hospital, in pursuance of this provision, and through his efforts subscriptions have been obtained to the amount of $70,635.72, of which over $36,000 have already been paid in cash. Mr. Neill testified that he had a personal acquaintance with a very large number of the individual subscribers, and that he was thus able to say the amount subscribed would, in his opinion, be fully paid with a loss of not over one and a half per cent. The congregational subscriptions have, for the most part, if not altogether, been actually collected. Besides these subscriptions, a number of gentlemen, prominent in the community and in the Methodist Episcopal Church, have given their written agreement, making up the amount raised by contributions to $100,000.

A square of ground, 400 feet in front by 509 in depth, at Broad and Ritner streets, has been purchased for $40,000, of which $10,000 have been paid in cash, and $30,000 remain upon mortgage at four and a half per cent. The deed, which is dated June 6, 1887, and duly recorded, is from Nelson Beardsley to the Methodist Episcopal Hospital. Plans and specifications have been prepared by Thomas P. Lonsdale, an architect of experience, under the advice and suggestions of Dr. Billings, of Washington City, an authority of great eminence in all matters relating to the building and management of hospitals, aided also by Dr. Horatio C. Wood, one of the originators of, and for many years connected with, the hospital of the University of Pennsylvania. The scheme contemplates the ultimate erection of six distinct, separate buildings, each complete in itself, in two parallel rows, three buildings on each side, with a central building connecting with each, containing boiler, etc., etc. The buildings, which are to be on what is known as the

### Adjudication.

pavilion plan, are to be constructed of brick and stone, two stories and a basement; the basement to be used for ventilating purposes, and the upper stories as the hospital. The cost of each building, as estimated by practical builders, is from $60,000 to $65,000, and of the central boiler-house about $10,000. The design at present is to erect the boiler building and one only of the hospital buildings; the others to be erected from time to time hereafter, as the receipt of funds from other sources may permit. One building, however, will make a complete hospital with a capacity for fifty-six patients. When all of the buildings are erected, the capacity will be six times as great. Dr. Wood, who is one of the advisory board of the trustees, testified as follows:

" The scheme of the most modern hospitals is that they should be composed of a series of detached buildings, each one capable of accommodating from fifty to seventy-five patients, and each known as a pavilion. The Johns Hopkins Hospital is made up of a large number of these so-called pavilions, of one of which the plan is a copy. The plan has been gone over very carefully by Dr. Billings, who was originally sent by the Johns Hopkins Hospital to Europe to study all the hospitals there, who has probably constructed more hospitals than any other man in the world, who is the government expert in hospital matters, and who is known and recognized on each continent as an absolute authority in such matters. I do not think it is possible to have a plan which would afford better results for working purposes. If the hospital should grow by accumulation of funds, the increase comes, naturally and architecturally, by the addition of pavilion buildings, and there is therefore no waste of money for alterations, because everything is complete for an almost indefinite growth. The ground purchased is of large extent, sufficient for a hospital of 400 patients. The proposed hospital would probably average about 400 patients, continually present. It is hardly possible for a hospital to have all its beds occupied all the time. A certain number of beds must always be reserved for emergencies; and besides, some of the beds will have to be occupied, probably, by the help, and a few by private patients, so that I think it is fair, in estimating the cost of the hospital, to count on 40 beds in each building when the hospital is reasonably full. These

Adjudication.

patients ought to cost about $1 per day. The cost of patients in the University Hospital is $1.11 per day; the Pennsylvania Hospital, $1.08, and the Episcopal Hospital, $0.96 per day. . . . . . If a hospital with 40 beds is run at the rate of $1 per day for each patient, the annual expenditure will be about $14,000. If the building and lot are paid for, and this sum of $230,000 is invested, the income will be about $11,500, leaving a deficiency of $2,500 a year. To meet this deficiency there is, first, a certain income from pay patients. I have never known a hospital whose prospects for its permanent success, at this stage of its procedure, were more certain or better. The income would be about $11,500, and the probable income from pay patients about $2,000, leaving $500 to be raised by the various churches."

The cost of furnishing and equipping each building, as estimated by Dr. Wood, will be from $5,000 to $10,000.

The scheme devised contemplates, in accordance with the established practice among other religious denominations under whose auspices hospitals are supported, congregational collections taken annually on a day appointed for the purpose. There has also been formed a contributors' association, the members of which are to make yearly contributions of not less than $5 each. This was started within the last month, and the subscriptions already amount to something over $600.

The presiding bishop of the last conference has again designated the persons to whom the residuary estate of the testator shall be paid, and has given the following certificate:

"KNOW ALL MEN BY THESE PRESENTS: That I, Randolph S. Foster, one of the Bishops of the Methodist Episcopal Church, and President of the Philadelphia Annual Conference of said church held in Philadelphia on March 17th to 21st, 1887, hereby certify: That I have appointed and designated the following named persons, being the Trustees of the Methodist Episcopal Hospital in the city Philadelphia, namely: James Neill, W. J. Paxson, W. Swindells, S. W. Thomas, C. W. Buoy, J. S. J. McConnell, G. Cummings, J. H. Hargis, A. J. Maloney, R. E. Pattison, J. J. Zeigler, G. S. Robinson, J. Simmons, C. Scott, James Gillenger, James Long, H. C. Wood, S. Green, John Flanagan, J. F. Keen and Peter Lamb, as the board of trustees to receive and administer the bequest of the late Scott

Adjudication.

Stewart, M. D., deceased, according to the terms of the last will and testament of said decedent, and to give a good and sufficient receipt and acquittance therefor.

"Witness my hand this seventeenth day of January in the year of our Lord one thousand eight hundred and eighty-eight.

(Signed) "R. S. FOSTER,

"Bishop of the Methodist Episcopal Church, and President as above mentioned."

Thus, it will be perceived, the present condition of affairs differs most essentially from that which existed when the previous account was before the court. Funds have been subscribed, a lot purchased, plans adopted, and the cost of the proposed buildings ascertained and provided for. It would be difficult to devise a scheme better adapted for carrying into practical operation the idea of accumulative growth suggested by what the testator says as to his gift being but a nucleus. He had seen instances of just such growth in some of the leading hospitals in the city, and these were doubtless in his mind when the codicil was written. . . . .

These instances simply illustrate what is a matter of common every-day observation, that a charity like this grows rapidly so soon as it assumes definite shape and becomes a reality. There seems then no further risk of failure, and contributions, donations and bequests pour in with certainty and increasing amount. Vires acquirit eundo. To what extent the annual contributions are depended upon for meeting the annual expenditures is strikingly shown by the cases of these three hospitals, more especially that of the Jewish Church; and all of them are equally rigorous in their exclusion of homœopathic and eclectic physicians from any participation in their management or in the treatment of patients. It is not to be supposed that benevolence prevails to a less extent in the vast body composing the Methodist Episcopal Church within the jurisdiction of the Philadelphia Conference—including, as it does, the territory between the Susquehanna and the Delaware, and extending from the southern boundary of the state to Dauphin county on the northwest and beyond Stroudsburg on the northeast—or that the proportion of adherents to the old system of medicine is not so great as among the other denominations.

The account shows that the residuary estate amounts to

Adjudication.

$268,596, composed of personal estate, $252,180.21, and realty, $16,416.67. The gross income, which in 1886 was $10,416.50, had, in 1887, increased to $11,961.42. Fifteen hundred dollars per annum are required to pay the three annuities, amounting in all to $1,500 ; and at the death of the annuitants, $25,000 of the principal will be distributable to individual legatees. This will leave a clear residue of over $243,596 (as the fund is accumulating daily), and a net income of not less than $9,000 per annum.

With this as an endowment fund; with $100,000, derived from other sources, at command for the erection and equipment of the buildings now required—the nucleus of the system ultimately contemplated; and with the means under the control of the conference through the agency of the annual collections from the subordinate congregations, who can doubt the success and entire practicability of the adopted scheme? It is said that there are over three hundred congregations, with a membership of about fifty-eight thousand. Twenty-five cents a year, or a fraction over two cents a month, from each individual, would give an annual income of $14,500; or, assuming one half to belong to the homœopathic or eclectic school, the same rate of contribution by the other half would yield $7,500. The numbers mentioned, as the auditing judge understands the testimony, are of actual membership, and do not include persons simply belonging to the congregation.

The testator was an educated man and a physician. He was doubtless familiar with the histories of the denominational hospitals of the city in which he lived, had read their annual reports, had noticed their growth from small beginnings, and knew the source upon which they relied largely, if not chiefly, for annual support. The subject of the disposition of his residuary estate had been before him for several years, and would naturally call for much careful thought and consideration. He was a practical man and a Methodist. He knew the authority of the conference, and had confidence in its integrity and sound common sense ; and the man whom it might select as presiding bishop could well be trusted. Hence, instead of himself suggesting it, and in this respect radically changing the provisions of the will, he left the determination of the scheme to the conference, indicating only the general locality in which the

Adjudication.

hospital should be erected. "I authorize," he says, "the conference . . . . . to organize in such way as to it shall seem best a scheme for this charity;" and the certificate of the presiding bishop is the only authority required to entitle the persons whom he designates to receive the money from the executor.

But, it is said, the will requires the hospital to be "established and founded;" that is, as contended, built and completely equipped ready for immediate occupation, before the expiration of five years from the death of the surviving sister; or, if this is not the meaning, there must, at least, within that period, be the actual possession of moneys sufficient to erect, equip and endow; and as neither of these conditions exists or can exist, the estate, it is claimed, must pass to the heirs and next of kin.

The words "founded and established," even when standing alone, do not, necessarily, imply completion. To establish, as defined by Bouvier, is "to found, to create, to regulate;" and foundation or to found, as "the establishment of a charity. That upon which a charity is founded and by which it is supported." For this, Sutton's Hospital Case, 10 Co. 23 a, is referred to, where it is said :

"It is to be known that in law there are two manners of foundations, one fundatio incipiens, the other fundatio perficiens, and therefore quatenus ad capacitatem et habilitatem, the incorporation is metaphoricé called the foundation, for that is the beginning, as a foundation quasi fundamentum capacitatis, or preceding the whole, and therefore in 21 H. 6, 4 a, a writ was brought against John Arden, Abbot of St. John Baptist or Colchester; the defendant pleaded that before time of memory foundation was made of the same place per nomen Abbot, eccl' et monast' de S. Joh' de Colchester, etc., where foundation is taken for incorporation; 38 E. 3, 14; 38 E. 3, 28 a, 20 H. 6, 27 a, and 18 H. 6, 16 a, in the Dean and Canons of Windsor's Case, and divers other books agree with the same; sed quatenus ad dotationem, the first gift of the revenues is called the foundation, and he who gives it is the founder in law, for proprie fundatio est quasi fundi datio, and the first gift is fundamentum dotationis seu collationis, et appellatione fundi ædificium et ager continentur; and that is proved by the statute of West. 2, c. 41."

Adjudication.

But without dwelling on the precise, literal signification of the terms employed, which in the construction of wills is never to be too strictly regarded, it is clear that this testator did not mean that if the hospital was not built, or all of the required money paid into its treasury within the designated period, his estate should go to his heirs. Had this been his intention, he would not have spoken of the required scheme as one "seemingly" certain of success; for success in that case must have been absolutely and necessarily certain. Throughout the codicil, he seems to contemplate the possibility of failure, even after the money has been properly paid to the persons appointed to receive it. "I desire," he says, "it distinctly understood, however, that in paying over my estate to such persons as shall be designated to receive it, my trustees assume no responsibility as to the practicability of the scheme nor as to the proper application of the fund thereto." All that he required was that the conference and bishop should not call for the money until "they have devised a scheme for the hospital, practical and seemingly certain of success." The question of practicability and seeming certainty of success was left exclusively to them, and a discretion thus given will not be controlled or interfered with by a court of equity unless a fraudulent or manifestly improper exercise of it should be attempted. As was said by Judge STRONG in the opinion quoted in Williams's App., 73 Pa. 285 : "A court of equity does not interfere with a discretion reposed, except in cases of clear abuse, when the court can conclude that the donee of a power is acting in fraud of it." See also Perry on Trusts, § 911, and authorities there cited. There is not, nor could there be, any suggestion of fraud in the present case; and no court could say that the scheme devised is not practical and seemingly certain of success, or, in view of the evidence already referred to, that it is at all likely, or even possible, that the estate will be "wasted in an abortive scheme."

It is sought, however, to give controlling effect to the words of the testator: "I do not wish my estate wasted in an abortive scheme, nor buildings commenced unless the funds at command are sufficient to erect, equip and endow them;" it being contended that by "funds at command" were meant moneys actually collected in cash and in the possession of the

Adjudication.

conference. The effect of this would be to read the will as if the words were "moneys in hand," instead of "moneys at command," though the expressions are by no means synonymous. The testator doubtless had in his mind the supreme authority of the church under whose auspices the hospital was to be conducted, and he certainly would regard moneys subscribed in the manner customary in the church as "at command," in the sense employed by him. Moreover, the condition of having funds at command, though it is to precede the commencement of buildings, is not required in advance of the payment by the executor to the persons designated by the bishop. The devising of a scheme, practical and seemingly certain of success, is all that is required for this purpose; and what is said by the testator in the sentence referred to is entirely satisfied by regarding it as uttered in the way of advice as to the subsequent use of the money.

It is true that the heirs of a testator are to be favorably regarded in the construction of his will, and not to be disinherited except by express words or necessary implication; but charities are also favored by the law, and in some respects even more so than heirs, certainly than collateral heirs. The statute which forbids accumulation for more than an existing minority, excepts accumulations intended for charities; and relief against a defective execution of a power, which is refused as to individuals not dependent for support upon the donee of the power, will be afforded where the appointment is to a charity.

But here, except in a single event, the heirs have been disinherited in express and unmistakable terms. They are not to take unless "the impracticability of the establishment of the proposed hospital shall have been demonstrated;" and this demonstration is to arise, not from the failure to erect, equip and endow within the five years, but as the result of the inability of the conference to devise a scheme practical and seemingly certain of success, "by reason of the failure of such presiding bishop to certify persons to receive the residuary estate for the purposes aforesaid." There has been no such failure, and, in the opinion of the auditing judge, after setting apart enough to secure the annuitants and the sums payable at their death, the estate held by the accountant should now

be surrendered to the persons designated as above to receive it. It will accordingly be so awarded.

The auditing judge then made a distribution directing that after the payment of the costs and setting apart $35,000 to secure the annuities and the payment of the legacies payable at the death of the annuitants, the balance of the fund "composed of the securities then remaining in the hands of the accountant, will be paid and transferred to the persons designated in the certificate of the bishop of the Philadelphia conference, as hereinbefore set forth, for the use of the Methodist Episcopal Hospital in the city of Philadelphia, in accordance with the provisions of the codicil."

To the foregoing adjudication, Mary N. Seagrave and others filed a large number of exceptions, alleging error :

1. Because the learned judge did not award to the heirs and next of kin the library bequeathed to them in item 15 of the will.

2. Because the learned judge did not award to the heirs and next of kin the whole of the residuary estate given to them by the last item in the codicil to the will.

3. Because the learned judge awarded the residue of the estate to the persons named in the adjudication as trustees for the use of the Methodist Episcopal Hospital in the city of Philadelphia.

The other exceptions were to the finding or the omission to find certain facts from the evidence, the final one being the following :

28. Because the trustees of the hospital were not to receive the bequest and devise unless they had complied with the conditions of the will and codicil within the five years, and these conditions were precedent conditions, and must be construed strictly as against the trustees and in favor of the heirs at law and next of kin ; and the testimony shows that these conditions have not been complied with. The burden of proof was upon the trustees and they have not clearly shown a compliance with the requisitions of the testator.

On May 5, 1888, said exceptions having been argued before

Arguments.

the court in banc, they were dismissed, opinion by HANNA, P. J., the adjudication confirmed and a final decree entered in accordance therewith. Thereupon Mary N. Seagrave took this appeal, specifying that the court erred:

1. In awarding the library and the residue of the estate to the Methodist Episcopal Hospital.

2. In not awarding the library and the residue of the estate, including the library of the testator, to the heirs at law.

*Mr. George Junkin* (with him *Mr. Edward A. Price*), for the appellant:

The mere certificate of the bishop as to the persons who shall receive the bequest, does not "found and establish a hospital," nor comply with the direction of the testator, that such erection shall be made within five years after the decease of his last surviving sister. The true construction would seem to be, that these conditions were to precede the bishop's certificate, and that he was not to act until these provisions of the will had been complied with. Not being complied with within the time mentioned, as was directed, the impracticability of the proposed hospital has been demonstrated within the meaning of the will, and the fund should go to the heirs at law of the testator: Attorney-general v. Hall, 9 Hare 647; Longstaff v. Rennison, 11 Eng. L. & E. 267; Attorney-general v. Hobson, 10 Jur. 300; In re Glancy, 16 Beav. 295; Hopkins v. Phillips, 3 Giff. 162; Dunn v. Bownes, 1 Kay & J. 396; Tathan v. Drummond, 4 DeG. J. & G. 484; Beekman v. People, 37 Barb. 360; Dom. & F. M. Soc.'s App., 30 Pa. 425.

*Mr. Furman Sheppard* (with him *Mr. Andrew J. Maloney*), for the appellee:

1. The words "to found" and "to establish" do not in law, or by their lexical meaning, or in common parlance, necessarily imply the erection of buildings. The erection of the buildings and the equipping of them, are acts subsequent to the founding of the hospital. They may take place from time to time. They are, indeed, completive of the founding, or in fulfilment of it, but they do not constitute it, and are separate and distinct from it: 6 Viner's Abr. 276, 277; Wartman v. Philadelphia, 33 Pa. 202; Richmond v. Supervisors, 18 Am. & E. Corp. C. 520.

2. Under the statute of mortmain, 9 Geo. II. c. 36, all gifts. to charities that require, or direct, or imply, that money or personal property is to be turned into land, are statutorily void. Hence a gift " for building or purchasing a chapel," a direction to " establish," or to " provide," or to " found," or to " endow," is frequently held to imply or authorize building, and is therefore void. The cases cited by the exceptant are applications of this doctrine, and they will be found thus explained in Theobald on Wills, 2d ed., 302–313. They do not decide and were not intended to decide that a hospital could not be considered as founded or established, until or unless the buildings were erected, equipped or endowed.

PER CURIAM:

We need not add anything to the careful and elaborate opinion of the learned auditing judge of the court below. The decree is affirmed for the reasons given by him.

Decree affirmed and the appeal dismissed at the costs of the appellant.